The next case is number 221783, TBL Licensing LLC v. Daniel I. Werfel. At this time, would counsel for the appellant introduce himself on the record? Good morning, your honors. Shai Voretsky with Skadden Arps on behalf of Petitioner Appellate TBL Licensing. Good morning. May it please the court, if I could, I'd like to reserve four minutes for a rebuttal. This appeal is about how the IRS must tax overseas transfers of intangible property, like the Timberland trademark, in Section 361 reorganizations. Does Section 367D require accurate annual taxes based on the annual income attributable to the intangible property, or does it require a single lump sum payment years before anyone knows for Congress enacted Section 367D to set up an annual payments rule for intangible transfers in Section 351 and 361 exchanges. Section 367A already had a universally applicable lump sum rule. The point of Section 367D, as the statute's text, structure, and purpose make clear, was to establish a new annual payments rule for accurately taxing income as it's earned. The IRS's contrary interpretation is that the last step of every Section 361 reorganization triggers a lump sum payment. In other words, the IRS claims that, setting aside the odd, very rare, multi-year 361 reorganization, the annual payments rule never applies to Section 361 exchanges. That can't be right because it nullifies Congress's choice to include Section 361 exchanges in Section 367D. The IRS, in fact, ultimately agrees that Congress couldn't have intended for the baseline annual payments rule to never apply to 361 exchanges, and for that reason, the IRS claims that Treasury regulations rescues specified 361 exchanges and subjects them to annual payments treatment after all. That doesn't work. For one thing, it's not plausible that nullifying its own purpose, unless, to use the IRS's words, Treasury steps in and decides to write regulations that, quote, modify the result under the statute. For another... How do you... You've sort of skipped a bit over. You would usually start with the text here, and such transfer seems to be somewhat of a problem for you. You need to define such transfer in a way that doesn't seem obvious in first reading the statute. So, Judge Kayada, I think that disposition following such transfer has to be understood to mean a disposition following a completed Section 361 reorganization. Where does that... Maybe... Excuse me for interrupting. Maybe you're about to explain that. That's so critical to your argument that the disposition of the intangibles does not occur until the reorganization is complete. Where do you get that concept that the reorganization has to be complete before the relevant disposition occurs? So, Section 361 only applies when there is an asset for stock exchange and a subsequent distribution of the stock. We know that from Section 361A and C. Section 361A refers to an exchange in pursuance of a reorganization. The qualifying reorganizations under 368, which is what 361 tells us the tax treatment for, all in turn require a distribution, and that's also reflected in Section 361C. I don't think it's disputed in this case. I think it's common ground that in order to have a completed Section 361 reorganization, you need to have both the asset for stock exchange and the subsequent distribution of the stock. I think the implication of that for 367D... I'm sorry. I'm trying to understand. Is it when the subsequent disposition of the stock takes place, is that coincident with the completion of the reorganization? Is that happening simultaneously? So, the distribution of the stock that is part of the 361 reorganization, it happens virtually simultaneously, very, very close in time, and it is only when you have that distribution that the 361 reorganization is complete, and it's a disposition following that if you have either a direct disposition, meaning a transfer of the intangible, or an indirect disposition, which would be a sale of the stock in the entity that holds the intangible. Only when those things happen after the completed 361 reorganization does the lump sum rule kick in as an exception to the annual payments rule. Clearly, when you have a transfer here at the beginning, when the intangibles go to foreign and the stock of foreign goes to domestic. So, we've got what strikes me as pretty clearly a transfer. You've then got the stock going up to the foreign parent. That seems to be a disposition. So, don't we have a disposition following a transfer? It seems that we do, but you're making an argument that if we take that reading, that it will mean that Congress in a roundabout way gave with the one hand and then took with the other as far as transactions described under 361. It's like a, but it's not a surplusage argument. It's just that Congress took a roundabout way of doing this and why would it do that? That's how I'm understanding your argument. So, I think it's more than just that Congress took a roundabout way. It's that if that is what Congress did, then the court would be reading what Congress did in Section 367D to essentially be for all kinds of property, tangible and intangible alike, had been the lump sum rule. That was from 367A1. In 1984, Congress enacted 367D in its substantially current form to codify an annual payments method and it put 351 and 361 exchanges on an equal footing for purposes of that by the commissioner that would vary that treatment. Well, and it didn't specify how far that variance could go. So, it did allow for an exception, but I think it's important to look at that language and consider the scope of Treasury's authority there. Section 367D1, that's where we have the exception, says, except as provided in regulations, subsection A shall not apply and subsection D shall apply. What that authority lets Treasury do, it lets it take certain transactions out of 367D's annual payment regime and put them back into 367A's lump sum rule. If for some reason, the annual payments rule under 367D won't work for a particular transfer. That's the only way to understand the limited scope of Treasury's regulatory authority without creating what would otherwise be a significant non-delegation problem. You can't read the exception to regulatory authority, the exception that gives the Treasury regulatory authority, you can't read that exception to allow Treasury to rewrite section 367D's rules from whole cloth. Well, if we accept your argument, then your argument would fit like a glove transaction in which the original domestic transferor disappears and the assets end up with effectively or indirectly a foreign parent who would not be available to pay the taxes. If we accept your argument. So, a few responses to that, Judge Kayada. First of all, that is a problem that if Treasury thought that was a problem, that is something that they could fix pursuant to their regulatory authority by a simple regulation. Yeah, here you go. If that could be fixed, that then meant that Congress in 84 intended that there would with that exception be some transactions that could be described in 361 which would be accepted. Hence, that unwinds your argument that there's a complete circularity here. I don't think it does, Judge Kayada, because the reason that that could potentially be fixed if it were a problem, and I would also note that Treasury has not identified any situation where that's happened. That's contrary to the argument under the statute as you're asking us to construe it and under the regs as they exist, all the assets could end up with a foreign corporation and no tax would be paid. So, I think the reason that that could be fixed, though, is that in that situation. You agree that is the situation. If we accept your argument, then as we walk out of here today, that's the situation that would need to be fixed. And just to supplement Judge Kayada's question, isn't that exactly the problem that Congress was concerned about in 1984 when it dealt with the transfer of intangibles? That's exactly what they did not want to happen, is it not? So, to take your question first, Judge Lopez, no, that's not what the legislative history tells us that Congress was concerned about. Congress was concerned about the problem where companies might invest in an intangible and before it becomes profitable, send it offshore at that point and allow it to become profitable in a lower tax jurisdiction so that the lump sum approach that was already in place in 361A wouldn't capture the value of the intangible. And Congress thought that the way to address that problem and the way to more regime. That's why the legislative history shows us that Congress preferred an annual payments regime. Treasury itself, in various statements and regulations over the years, has recognized that Congress had a preference for the annual payments regime and that what was motivating this was not the concern about the kind of tax evasion that you're describing, but rather the problem with incorrect valuation of the intangible and the annual payments as it addresses that. It's a record clear that you talk about the desirability of the annual payment scheme. It's more exact, perhaps fair. But the government points out that those, that annual payment scheme results in lots of disputes, some litigation. The lump sum payment has its problems too. There's inexactitude with both. And it seems that in this situation, Congress plausibly, rationally expressed a preference for the lump sum payment approach. So while there can be valuation disputes, no matter which method you choose, it is inherently more accurate to value once you know in the future what the actual sales and revenue is being sold as opposed to trying to value something decades into the future. With respect to Congress's preference, the IRS itself has explained, and this is, for example, from Chief Counsel Advice Memorandum 2022-003, by turning off, quote, by turning off the application of Section 367A in these cases, the Section 367D annual inclusion regime reflects a congressional preference against providing immediate gain recognition with respect to intangible property. The congressional preference, and again, this is quoting from Chief Counsel, was for preserving the continued application of the annual Section 367D inclusion stream. But certainly Congress wasn't hoping there would be no tax at all, ever, which your construction leads to. So nothing in Section 367D requires the U.S. transferor itself to make the annual tax payments, and Treasury's regulations contemplate that a party related to the U.S. transferor would report and pay tax on the annual payments. But that would just be fortuitous. And maybe I'm missing it, but I think if we were to adopt the taxpayer's construction here, then the transaction in which there is no Libel or American subsidiary on top would equally fit that construction, and we would have no tax. So there may not have been any today, but the day after our decision, there may be so many in the works. Well, I think as a practical matter, there wouldn't be. These sorts of 361 reorganizations are undertaken by multinational corporations that are, as a practical matter, going to have a U.S. presence that would be responsible for the tax. How do we know that? Well, for one thing, we know that from the fact that the IRS has never provided any example of this being a problem. In 2012, they issued a notice in which they actually proposed a regulation that would address this situation. They didn't follow through with promulgating the regulation. And so in the real world, this is simply not a problem. And the rule that we are advocating for is not one that would be a new rule for this court to adopt for the first time. It's the understanding of the statute that Treasury itself, until this transaction in this case, has adopted for years. Let me ask you, I understand that point. Let me ask you another point that I'm not sure I'm understanding correctly or not, but I think it's in the government's brief and I'm not sure I saw a response in your brief. And that had to do with 367 D2B. As I understand it, under that section, the earnings and profits of TBL foreign are to be reduced by the amount of earnings and profits that are required to be included in the dissolving, then how else would we include the 367 payments in its income other than doing it under the distribution payment rule? Well, I think what happened in this case is that the closest related U.S. entity that has a controlling interest in the foreign entity, that's Lee Bell, picked up and reported the taxes. Isn't that fortuitous? We have to look at the statute, not as if it was written with this transaction specifically in mind, but how the statute works. And it seems if we take your construction of how it works, then we've got a situation where the only way the 367 D2B would itself work is if we reject the annual payment rule and use the disposition payment rule. Well, Judge Kadd, I don't think it's fortuitous. I think that there are lots of instances under the tax code and treasury regulations where someone other than the person or entity that's recognizing the gain pays the tax. That's quite unusual, isn't it? That's not the normal situation. What is Lee Bell's relationship to the intangibles? It really doesn't have any relationship to them. Isn't that correct? So Lee Bell is the closest related U.S. entity that is a shareholder of the foreign entity that holds the intangibles. And having Lee Bell pay the taxes, that's not fortuitous. That aligns with the sort of treatment under subpart F for exactly this sort of situation where you can have U.S. shareholders who own foreign corporations and the U.S. shareholders report and pay taxes on those foreign corporations' income through the subpart F mechanism. And there are a number of instances in the tax code, in tax practice. It's not fortuitous and it's not unusual where you have one entity that is paying taxes on behalf of another. You can have consolidated group returns. You can have a secondarily liable for taxes. You can have the subpart F regime. And it's not surprising that Congress left this, was silent on this issue. First of all, because the U.S. transfer does remain in existence in a 351 exchange. And second, because Treasury has gap-filling regulatory authority. The other point I would make on a 351 exchange, if the court were to adopt the IRS's choice, either have a 351 exchange without having the entity liquidate, and in that situation you get annual payments treatment, or do a 361 exchange as was done here and then there's lump sum treatment. It's restoring exactly the kind of optionality that Congress wanted to do away with when it enacted Section 367D to solve the problems with the lump sum regime that had existed under A. So how would this work? How would the 367D payments be included in the income of the transferor under, if we, that's going to go out of existence? So we've got one year to do it. Would it pay the first annual payment? So as a practical matter, I would probably depend on the status of the transferor. I don't know what happens in the transferor's final tax year, but the point of the annual payments method is that there will be annual payments included in income for years going forward. Right, but what happens that first year? So I'm not sure offhand what that entity files in its first year, but there's no question that... And then the second year, that entity is not there anymore. And so in that situation, something like the subpart F regime that we described in our brief comes into play. And again, that's designed specifically to allow U.S. shareholders who have a share in foreign corporations to report U.S. tax on their share of that foreign income. And so that's what would happen in this kind of situation. So I think what you're saying is that what would happen in the second year when the transferor, TBL domestic, disappears is the IRS would look around and hope there's an American parent there in the transaction somewhere. And if there isn't, out of luck, no tax. Well, I think that the American parent would have an obligation in our self-reporting system to pay taxes. But what if there isn't an American parent? What if it's a foreign parent? So again, if there is no American parent, I think that's something that the IRS could address by It just hasn't seen that as a problem. Again, it even went so far as to propose the regulation and not follow through. And then back to 367 B2B, whose income is affected by the transaction? In other words, who's required to put the 367 D payments into its income if there's no other corporation other than the one that's disappeared? So, again, I think this is a situation where if this were a problem, the IRS could exercise its regulatory authority to deal with that kind of a transaction by putting it back into A and making lump sum payments due. But again... I think we've got to the point now where under the construction that you're putting forward, we've got now two problems that the IRS needs to patch up. One is how to handle the 367 D2B payments, and the other is how to handle the situation where it's only a foreign parent. And again, if the IRS thinks those are issues, it can use its regulatory authority to turn the annual payments treatment off and put a particular kind of transaction that they've never identified occurring in decades of understanding the statute our way, put that transaction back into A and address it with a lump sum. Are there any more questions? Just explain to me, please, why when the transfer, in the scenario we have here, the transfer corporation which received, in exchange for the sale of the intangibles, the stock of the transferee corporation and then transfers that stock to the parent, why wasn't that the very disposition subsequent to the transfer that Congress contemplated when it of intangibles in the 1984 law? Why isn't that the very disposition that Congress had in mind? Because with that stock, that stock is the stock of the company that now owns the intangibles. So why isn't that the very disposition that Congress had in mind? That's what I'm struggling to understand. Because if that were the disposition that Congress had in mind, then Section 367D's annual payments regime would never apply to any 361. That disposition that we're talking about is an inherent part of every 361 exchange. And Congress did not write, it's not plausible to think that Congress wrote 367D in the way that it against the backdrop of 367A only to exclude all 361s from the annual payments regime. So the only way to understand disposition following such transfer is to understand it to mean a disposition that follows the completed 361 reorganization. And it's the completed 361 reorganization that triggers the application of 367. Again, I'm sorry to belabor it. When is that reorganization then complete? After the second transfer that I've been talking about, something else has to happen to make the reorganization complete? What is that? I think the reorganization is complete when the stock is distributed up to the parent. So in other words, we have the transfer of the intangibles going overseas, stock coming back, and then that stock gets distributed by the rights recipient to the parent corporation up the chain. Once that distribution happens, that's when the reorganization is complete under 361 and under 368. So one more question. How would, if we take your position, which I think in common sense terms is saying that the IRS's position has Congress giving with the one hand apparently as you read the statute and then taking away everything because every transaction will have that characteristic that is justified for taking it away, how do we translate that thought, that reading thought, into a rule of construction for statutory interpretation? It doesn't quite seem to be a Plessig argument. It seems to be more an awkwardness in drafting. I ask because we may find ourselves dealing with a situation here where a more obvious reading of the text puts such emphasis on such transfer and its force to that argument that it will need something fairly weighty to then counter it as far as a rule of construction. Which rule are we talking about here? So I think the rule of construction is simply one of understanding disposition following such transfer in context. The context, as we've been discussing, is that Congress enacted 367D2's annual payments regime against the backdrop of 367A, which already had a lump sum regime. And it simply doesn't make sense in context to think that when Congress was referring to a disposition following such transfer that it was referring to a transfer that was part of the 361 as opposed to the completed 361. I would also say textually if you look at 367D1, the trigger for it is transferring any intangible property to a foreign corporation in an exchange described in Section 351 or 361. So it's not just a transfer. It's a transfer in an exchange described in 361. A 361 exchange in turn requires that there... It's not really a 361 exchange. I'm sorry? It's not really a 361 exchange. It's a type of exchange that's described in 361. Right. So it's an exchange described in 361, but the exchanges described in 361 are ones that are in pursuance of a reorganization. And a qualifying reorganization in turn requires a distribution. So you simply can't think of the transfer separate from the exchange in 361, which in turn requires the reorganization. When Congress was referring to the exchange in Section 361, it was referring to that entire transaction. And the only way to make sense of Congress's language is that the relevant disposition is one that occurs after that entire transaction is complete. Thank you. You have reserved but four minutes for rebuttal. Thank you. I think we've given you a few extra on direct. Thank you, counsel. At this time, would counsel for the appellee please introduce herself on the record to begin? Good morning. May it please the Court. Judith Hagley from the Department of Justice, representing the Commissioner. Section 367D permits a U.S. taxpayer to transfer appreciated intangible property to a foreign corporation and defer recognizing the gain over the useful life of that intangible so long as it retains an interest in the intangible by holding on to the stock in the foreign corporation. Could I ask you just one question beginning? Basically, the IRS, the amount that's efficiency, it's almost half a billion dollars. What if your other party is correct? How much would the IRS generally be collecting under their theory? Would it go down to zero or be half or any rough idea of that? Under their theory of annual payments? Yes. It depends what the reporting each year and the proceeding below. TBL had argued that the government would actually collect more under the annual payments than it would the lump sum. I mean, in a response, there was that we're not trying to collect the most tax possible. We're trying to enforce the statute as written here. And from what they've reported or the other company, Libel, has reported, any idea of compared to? Oh, so I believe in the, I believe in the stipulations that at least for the 2011 to 2017 period that Libel had reported, I believe, about 500 million dollars. Let me see if I have an actual site for that. So, what about... I'm sorry, so it's reported 479 million annual payments, 2011 to 2017, and this is paid... So under that reporting scheme so far, it's between half a billion, 470 whatever million. It's a difference of 20 million, but we're not talking like everything's disappearing and nobody, the IRS is not getting paid. Not in this case, but with regard to Libel, Libel, nothing in the statute or in the regulations, you know, permits Libel to recognize the income. The statute requires the U.S. transfer to recognize the income. And when I say nothing requires, also, I mean, nothing permits, nothing requires. There's nothing, the IRS couldn't enforce this Libel arrangement against another taxpayer. The fact that Libel is doing it here... Libel, in fact, has been paying that money. Correct, and they've filed protective refund claims. And depending on the outcome of this litigation, they will get that money back. But what the statute requires is that the U.S. transfer is to report the income. And as soon as the U.S. transfer's interest in the intangible is severed by a disposition, that it will recognize that income immediately. And yes. And here that severance, as you put it, took place when? When the stock was distributed to, up to the foreign parent. There'd been some discussion with Judge Lopez about whether the distribution of the stock and the exchange of the intangible was simultaneous. And it's not simultaneous. Taxpayer had argued that in the tax court. The tax court rejected that. I believe it's at page 33 through 34 of the addendum. And what the tax court found, and what is in fact the case, is that the distribution of the stock follows the exchange of the intangible property for that stock. That's just the nature of how a reorganization works. It's a matter of logic. And that sequence of events, under the plain language of the statute, triggers the disposition payment. Taxpayers' argument appears to be, well, that's just odd, because under the terms of the statute, there'll always be a disposition when there's a reorganization. And that's odd only if you disregard why 367D was enacted in the first place. It was not enacted in 1984 because Congress was unhappy with a lump sum calculation. It was enacted because Congress was unhappy with taxpayers with intangible property that were transferring overseas in tax-free transactions and not recognizing the income related to that intangible. And this is because of prior IRS ruling guidance, adverse court decisions. That's what Congress was reacting to. And it wanted in every single case, without any exception, the U.S. transferred to recognize income related to the intangible when it was transferred overseas. And when its interest in that intangible was severed, to recognize it immediately. 367D sets up two payment, alternative payment plans. There's not a baseline annual payment rule in 367D. There's one that applies when there's a disposition. That's the disposition rule. And then there's one that applies when there hasn't been a disposition. It does, it does seem the taxpayer has a fair observation when it says under the IRS's position, the structure is that for foreign transactions, it's the IRS's position reads 367D1 is setting up a general rule. And then it proceeds to read the ensuing part of it as having an exception to that general rule that entirely swallows the general rule. I think that's much the force of their argument. And that seems very odd, they say, particularly if you look at it in context. Well, this is actually a common occurrence. Professor Bidker recognized this and discusses it in the treatise that we cite in the background section of our brief, that in cross-border transactions, Congress will frequently pass a very broad or strict rule to ensure that there's not going to be any tax avoidance. To ensure that, for example, the hypothetical that we discussed in our brief on 2830, you know, doesn't occur with these intangible and transfer, and no one's going to be left to pay the tax. So, Congress passes a broad rule, but at the same time gives Treasury regulatory authority to create back specific exceptions. And that is what Treasury has done here. Now, in the tax court, TBL relied on those exceptions. The tax court found that they didn't apply here, and TBL has not challenged that on appeal. Facing the actual statute, the statute as written triggers the disposition payment when TBL transferred the stock to its, in the distribution of the organization. In your example, the broad rule for which there could be exceptions is disposition payment. But the way the statute goes about it, according to your interpretation, is that it passes a broad rule of annual payment and then has an exception which replaces the general rule entirely with annual payment, with disposition payment. That's a little bit different than saying Congress makes a general rule and then the IRS can promulgate exceptions. We're talking about how is the general rule itself created, and here it's got that oddity. Well, I mean, if the court views it as odd, it's still, it's not an absurd situation, and the courts enforce odd statutes. We don't believe it is odd, and right in the context of what Congress was trying to do to ensure that the U.S. transfer, and this is not just in the text, it's also in the legislative history, this positive conference report that we cite from 1984, page 954 through 955 of that report, makes clear that Congress intended that when the transfer disposed of the stock that it received in exchange for its intangible property, that original transfer recognized the gain immediately. And that is how the statute works. I look at this statutory language and I find it, frankly, impossible to find in the plain meaning of the statute an answer to the question that we have before us. And I say that because to me that suggests that in the absence of a plain meaning, reading that answers the question, we do have to look at legislative history, which plays a very prominent role in the debate between the parties. And you rely heavily, I think, on that conference report from 1984, which does seem to focus very much on the transferor of the intangible property and suggests that the concept of disposition should be seen in relation to that transferor, when that transfer actually does dispose of the intangible. I mean, I doubt you are relying heavily on that legislative history. Is that correct? Is that a fair? We do rely on it because it supports the actual text. And the text of the statute requires the U.S. transfer to be the party, not some other party, someone like Lee Bell, who never owned the intangible property, to recognize the income. And it does it in two places. In 367 D-2A, the party that is deemed to have sold its intangible property and to receive the payments is the U.S. transfer. And then later in the next section in D-2B, and I believe that Judge Gatto was discussing this before, that section discusses the impact of these payments on the foreign transferee's earnings and profits. And in that section, it again refers to the, quote, amount required to be included in the income of the transferor of the property. That is the requirement that Congress set in the statute. Congress confirmed that that's, in fact, what it meant in the legislative history that we cite. And this is not an odd result because when the transferor's interest is severed with the intangible property, that only may not only be the last U.S. party left standing who can recognize this income. But it does cease to exist. And Congress wanted that party to be the person that recognized the income. So the only way, after a reorganization, that payments can be recognized in the proper party's income is through the disposition payment rule, unless Treasury has created a successor, which they haven't done on the facts of the statute. Counsel, let me ask just one question. And going back to when I asked you about the numbers, if, let's assume that we were to hold that the tax court was correct and we ruined the IRS's favor, the monies that Lee Bell has paid are close, you know, proportionally close to what the deficiency has determined. Would those still be credited to TBL? TBL is a separate taxpayer from Lee Bell. Lee Bell is part of VF Corporations Consolidated. So whatever Lee Bell has reported would not apply to TBL? Correct. Okay. So TBL would still be responsible for everything? TBL, yes. For the lump sum? For the lump sum. Okay. Correct. Correct. Counsel, how is that lump sum valued? How do you determine what the lump sum is? Is the tax obligation, is it equivalent to the value realized through the transaction? How do you calculate the lump sum? Because they challenge the lump sum as a very poor proxy for the value of the transaction because there's so much uncertainty about how these intangibles will be used over time. So it is a poor prediction of the value of the transactions. How do you actually, how does the IRS calculate the tax obligation under the lump sum payment scheme? Sure. Let me give you two responses. First, lump sums are calculated based on the fair market value of the intangible, the time of the disposition minus whatever basis may be in that intangible. Okay. That's how it's done. In this case, it's clearly not a poor substitute because it was based on sort of a gold standard in the pricing of intangibles and actual arms-length transaction between the Timberland Corporation and VF. They valued this transaction including how much the intangibles were worth. That's what TBL reported on its return. There's no dispute. IRS accepted that because it was based on an actual arms-length transaction. It's about the most accurate valuation of an intangible that you can get. But we realize that in other cases, they won't have that. And Congress was balancing a number of policies in Section 367D. You know, it prefers an annual payment, you know, for accuracy reasons, as long as there hasn't been a disposition. Prefers the disposition payment when there has been a disposition because the overriding policy in this statute is to ensure that intangibles are not transferred overseas without the transfer, the actual holder of the intangible, the party that has been previously deducting expenses against ordinary income, you know, related to that intention to make sure that that party recognizes the gain and recognizes the gain immediately when it's interest in intangible has... And it's the normal 361 transaction where that transfer goes out of existence. Yes. So unless you taxed under the disposition rule at that year, it's gone. That's exactly right. That's exactly right. And the final point I'd like to respond to is that taxpayer, TBL, is discussing, you know, the 351 choice. The taxpayers can just choose to do a 351 exchange and continue with the annual payments. And taxpayers always have the choice of how they want to structure their transaction and then they have to live with the tax consequences. As a practical matter, TBL here would not have structured their transaction as a 351 because this is all part of a larger tax plan. And this is not discussed in the briefs that's alluded to at our last footnote about why their proposal is a bad policy argument. It was discussed in the tax court briefs. But the purpose of this plan that VF had was it wanted to use its untaxed overseas earnings to acquire Timberlink. And normally when a taxpayer takes untaxed overseas earnings to acquire a U.S. asset, those earnings become subject to tax immediately under, I think it was 956 we cited in our last footnote. VF avoided that by converting that U.S. asset into a foreign asset by having TBL U.S. go into an outbound reorganization, become a foreign organization. So in this case, if they had used a 351, the U.S. asset would have remained a U.S. asset and the billions that VF Corporation had used of its untaxed earnings would have been subject to tax. So I'm just trying to fill out the picture a bit more fully than has been done. It has been referenced to, in the 84 legislation, there's a creation or a reference to the ability of the commissioner to pass regulations that, and as I understand the argument, that's been pointed to as a rebuttal, as a small rebuttal, but a rebuttal to the notion that the IRS's position is swallowing every single 361 transaction. As I understand it, the counter to that is that the IRS's regulatory exceptions can't be too broad to actually include transactions that are 361 transactions because of a non-delegation type issue. I think that's what I understand the argument to be. I'm hearing non-delegation for the first time. Yes, it wasn't in the reply brief. I heard it for the first time. Treasury has modified, using its authority, not just in 367D, which is specific authority to create exceptions, but also its authority under 7805 to more broadly adopt regulations. But what Treasury has done is that it has looked at situations where the stock is transferred after the exchange, and Congress's purpose in enacting this can still be balanced with the annual payment rule, and that's what it has done on facts that are not applicable here. Let me ask counsel, in the IRS's view, the statute and the current regulations, they're consistent with one another, correct? I'm sorry? The statute at bar and the regulations that are existing right now, in the IRS's view, they're consistent, correct? Exactly, they are consistent. Counsel, your opponent says it's entirely fanciful on the part of the government to envision scenarios where after a reorganization is completed, that there will then be no U.S. corporation that can be responsible for payment of taxes on any basis. How do you, I think you do invoke that as a concern and a concern that Congress had, and they say, you can't cite a single example of where that has happened, or it's just, it's an implausible hypothetical. What? It hasn't happened. Because the statute covers that situation. And the statute says that when that U.S. transfer disposes of the stock, a disposition payment. To my knowledge, no taxpayer has been brazen enough to try and raise that argue in light of the statute. And it's not a fanciful, it's in a basic reorganization, there are three parties, the U.S. transfer, the foreign transferee, and the parent. The parent can either be foreign or the parent can be domestic. If the parent's foreign, it does raise the problem that we highlight in the hypothetical. Luckily, the statute covers that. Treasury doesn't need to issue a reg to cover it. The statute covers, again, this is very common in the international area, statutes written broadly, giving Treasury the authority to issue regulations that address that specific situations. In sum, we ask the court to enforce the statute as written, that is how TBL would rewrite it, and affirm the well-reasoned, detailed decision of the tax court. Thank you. Thank you, Counsel. At this time, if Counsel for the Appellant will reintroduce himself on the record, he has a four-minute rebuttal. Thank you. Shai Goretsky on behalf of Petitioner Appellant, TBL Licensing. I'd like to make a few points on rebuttal. First, there's no question here about tax avoidance. The only question here is when the tax payments are made and how they are calculated. But there's no issue here about the petitioner, in this case, or any taxpayer avoiding taxes. Well, what if they were a foreign corporation that were at the top of this? In other words, what if the three parties here were American, foreign, and foreign? And the assets end up with the foreign parent, there would be no obligation of that parent to pay tax. Perhaps that would be a concern if you had a situation where there is no related entity in the United States left at all. Right. And the transferor, customarily in a 361, disappears. Well, even in this case, the transferor didn't disappear. It's a technical tax issue. It chose to become a disregarded entity for tax purposes. But what that means is that the next related US entity is- But if there is none? Well, but as a practical matter, multinational corporations are going to have some US-related entity. If you think about major taxpayers that engage in these sorts of transactions, they don't just send something offshore from the United States and then completely disappear from this country. As a practical matter, it simply doesn't happen. And again, the IRS hasn't pointed to that as an example. They could pass a regulate- they could promulgate a regulation to deal with that. Where there is a US entity, subpart F is not just a fortuitous way for that entity to pay taxes, it's a mandatory way for the entity to pay taxes. And again, that specifically deals with the situation where you have a US entity that has a controlling interest- Counsel, isn't it just fortuitous that in this case, the parent corporation- that we had a lebel, if you will, that- a related corporation that- it's a US corporation subject to taxes. I mean, you could have a scenario where that was not the case, which is what, in part, the IRS is worried about. Why- why- why couldn't that be? Again, I think as a practical matter, you couldn't, given the nature of multinational corporations, don't just disappear from the US market. Modern multinational corporations are going to have a US presence. They're going to have their lebel. Again- And what's- what do we- how do we know that? And how did Congress in 84 know it? I think we know that as a practical matter. I also think we know that from the absence of any problem that the IRS has identified. They've had decades- if they thought this was a concern, they've had decades to address it. They went so far as to propose a regulation. They didn't see fit to complete the process of promulgating that regulation. Right. But isn't- We- we know that as a- What do you say to- to their argument is that this is a rather aggressive tax position to be taken that no other one's given the such transfer language in the statute has heretofore taken. But if we were to bless it, it might be a- a line at the door. Well, again, though, I think- and we- I see my time is short, but we described in some detail in our brief the extensive regulatory guidance from the IRS reading the statute our way, saying that the annual payments rule applies to 361 reorganizations. What Treasury has said is that when you have a disposition to an unrelated party, in that situation, the lump sum rule kicks in. But when you have a disposition to a related party, the annual payments method applies. That's precisely this kind of a situation where you have a disposition to a related party, related to- to the U.S. taxpayer, and the IRS can still collect taxes and has collected taxes under the annual payments method. So Treasury- Treasury has interpreted that word disposition to refer to transfers to unrelated parties, but not to include transfers to related parties. That's also an answer, Judge Kayada, to your earlier question about how to get there under the statute. Treasury itself has interpreted the word disposition to only cover a disposition to an unrelated party, which is not something that- that happened here. Okay, your time is up. Thank you to both counsel. Thank you, Your Honor. That concludes argument in this case.